J-S18045-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
NICOLE R. ENGLER-HARPER :
:
Appellant : No. 106 MDA 2022

Appeal from the Judgment of Sentence Entered January 6, 2022
In the Court of Common Pleas of Lycoming County Criminal Division at
No(s): CP-41-CR-0000238-2019

BEFORE: BENDER, P.J.E., McLAUGHLIN, J., and McCAFFERY, J.

MEMORANDUM BY McCAFFERY, J.: **FILED: AUGUST 16, 2022**

Nicole Engler-Harper (Appellant) appeals from the judgment of sentence entered in the Court of Common Pleas of Lycoming County, following her jury convictions of two counts of endangering the welfare of children (EWOC).[1] Appellant raises three claims: (1) there was insufficient evidence to support her EWOC convictions; (2) the verdict was against the weight of the evidence; and (3) the sentence was unreasonable and excessive. We affirm.

We glean the underlying facts supporting Appellant's convictions from the November 15, 2021, trial testimony. Appellant rented a home on Washington Boulevard in Williamsport, Pennsylvania, that she shared with her

_____

[1] 18 Pa.C.S. § 4304(a)(1). Both crimes were graded as third-degree felonies. *See* Order, 11/18/21.

paramour, the couple's two-year-old biological son (D.K.), and her paramour's five-year-old son (M.K.) from a prior relationship. The paramour was considered the "breadwinner" of the family and worked outside the home. N.T., 11/15/21, at 47. Appellant watched the children during the day and was their primary caretaker as they were "in her sole custody[.]" *Id.* at 48.

On the morning of September 27, 2017, Dean Severson, a Codes Enforcement Officer for the City of Williamsport, went to Appellant's residence with a rental agent to perform a home inspection. N.T., 11/15/21, at 14. Appellant was mowing the yard at the time. *Id.* at 17. After Officer Severson entered the home to begin the inspection, Appellant rushed past him in the stairwell and "unlock[ed] a lock on a door" to a bedroom on the second floor. *Id.* at 20. Officer Severson noticed there was "a regular padlock with a key" and a "hasp[2] on the door." *Id.* Inside the room, the inspector observed M.K., in only his underwear, lying on a mattress on the floor. *Id.* Additionally, there were: (1) no sheets on the bed; (2) a pillow without a pillowcase; (3) a light without a lampshade; and (4) some minor holes in the wall. *Id.* at 19-20. Additionally, the windows were boarded up, divesting the room of natural light. *Id.* Officer Severson instructed Appellant to remove the lock. *Id.* at 21. The inspector noted that Appellant responded in an irritated way, stating:

---

[2] Severson described a "hasp" as a "metal device" that is screwed to "the jamb on the door." N.T., 11/15/21, at 20. He stated, "you can put [the hasp] over [a] little hook. When you close it, you can put the lock on it." *Id.*

"[W]hat do you want me to do [—] let him out and break everything in the house[?]" *Id.* at 22. Officer Severson then told Appellant that if she did not remove the lock, he would call the Children & Youth Services Office (CYS). *Id.*

Officer Severson moved to the second bedroom on that floor when Appellant took "a screwdriver out of another hasp that[ was] on that door that was locking that door closed." N.T., 11/15/21, at 23. He described the second bedroom as very cluttered — there were "dressers on top of dressers and a TV on top of another dresser' that was "leaning[.]" *Id.* He was concerned about the device falling on the child, D.K., who was sitting in a playpen. *Id.*

Officer Severson contacted the landlord, who "got a screw gun and removed [the locks from] the door[s]." N.T., 11/15/21, at 24. He noted it was "illegal to have a lock on the outside of the bedroom door" because if there were an emergency, a person could not get out. *Id.* at 25. Appellant attempted to give Officer Severson the locks before he left.[3] *Id.* at 28. The inspector returned to his office and called CYS to report the incident. *Id.* at 25.

Edward Frame, a caseworker for Lycoming County CYS, received a referral report for "confining and restraining" two children from Officer Severson and he visited the home around 3:45 p.m. that same afternoon.

_____

[3] It is unclear from the record whether the inspector accepted the locks.

N.T., 11/15/21, at 30-31. While outside the residence, Frame first met Appellant's paramour, who stated he was aware Officer Severson was there earlier, and "that there was an issue." *Id.* at 32. Appellant then came onto the porch and was visibly upset. *Id.* Frame noted her initial response to him after he mentioned the report was: "Oh, my God, they called you[.]" *Id.* Appellant informed him that the locks had been removed. *Id.* at 33. It was Frame's understanding that M.K.'s room was locked "because that was [Appellant]'s way to assure safety" and the door to D.K.'s room was locked "to keep [M.K.] out of that room." *Id.* at 50. Furthermore, Appellant informed Frame that "she was unable to control [M.K.]'s behaviors and that's why he was locked and boarded — the windows were boarded and that she had locked her room to keep him out." *Id.* at 53. Appellant also told the caseworker that M.K. attempted to "escape the residence" and went into the bathroom and played with dangerous items. *Id.* at 53-54.

Frame went inside the home and while, walking up to the second floor, "got a strong sense of urine." N.T., 11/15/21, at 33. Frame entered M.K.'s bedroom,[4] and observed the child standing, wearing only a pair of shorts. *Id.* He noticed the bedroom smelled of urine, and the carpets were saturated with what he believed was urine and it felt sticky. *Id.* at 34. There was a soiled,

_____

[4] Frame recalled that the door to M.K.'s bedroom was closed when he got there. N.T., 11/15/21, at 34.

urine-stained mattress on the floor with a small blanket and training toilet in the corner of the room. *Id.* at 33-34. There was no other furniture or toys in the room. *Id.* at 33. Like Officer Severson, Frame also saw that the two windows were "boarded with drywall screwed over, so there[ was] minimal light coming into the room." *Id.* He also noticed the baseboard heating vents had been removed, which was "concerning" because there were "small metal fins that [were] attached to piping that [were] sharp." *Id.* at 35. Moreover, Frame saw holes in the walls and a lot of chipped paint. *Id.* Frame advised Appellant to clean the room, find appropriate bedding, remove the boards from the windows, and remove the toilet. *Id.*

Frame then went to D.K.'s bedroom, which he learned the child shared with Appellant. N.T., 11/15/21, at 36. He saw the child sleeping in a portable playpen that was "dirty." *Id.* at 37. He noted there were blankets over the windows, and it was "overly cluttered." *Id.* Frame subsequently told the paramour what changes were necessary, and that he "would return to the house to ensure that" what he "had requested was rectified." *Id.*

The next morning, Frame arrived at the residence with an emergency outreach worker, Jackie Hummer. N.T., 11/15/21, at 45. Frame observed that none of the requested changes had been made. *Id.* He "learned" from M.K. and Appellant that the paramour "was aware that the children were being locked in their room." *Id.* at 46. Frame "did not believe that there w[ere]

appropriate protective capacities for the children to remain in the home," and thus, requested emergency custody. *Id.*

After his supervisor granted the emergency custody request, Frame telephoned the paramour, who was at work. N.T., 11/15/21, at 47. The paramour indicated that CYS do "whatever [they] felt was best." *Id.* Frame returned to the residence with two caseworkers, Elizabeth Spagnuolo and Sarah Neff, and two Williamsport police officers. *Id.* at 46-47. The children were placed in Frame's custody and removed from the home. *Id.* Frame noticed that Appellant was "holding [D.K.] and sobbing about him being taken[,]" but she showed no attachment to M.K. *Id.* at 48. Frame asked Appellant to pack clothing for the children but she could not do so because all of the children's clothes "were dirty." *Id.* at 50.[5]

Appellant was charged with two counts of EWOC and one count of unlawful restraint of minor.[6] The matter proceeded to a one-day jury trial on November 15, 2021.[7] The Commonwealth presented the testimony of Officer

_____

[5] At Appellant's sentencing hearing, Frame provided supplementary testimony that Appellant "monitored the food and water intake to these boys." N.T., 1/6/22, at 6. Moreover, he stated that when he took custody of them, they were "under the fifth percentile for their height and weight." *Id.*

[6] 18 Pa.C.S. § 2902(c)(1).

[7] Appellant was originally tried on February 5, 2020, but the jury failed to reach a verdict, resulting in a mistrial. Due to COVID-related issues, a second trial was not held until November 2021. At the time of the trial, the Commonwealth withdrew the unlawful restraint charge.

Severson and Frame about the conditions of the residence and their interactions with Appellant. The Commonwealth also presented the testimony of Spagnuolo, the assessment caseworker for CYS, and Kara Smith, M.K. and D.K.'s foster parent. Each described the behavior of the children upon their removal from the residence.[8]

Appellant testified she was unemployed at the time of the incident and was taking care of both boys. *See* N.T., 11/15/21, at 76-77. She stated that M.K. had the following behavioral issues: (1) he did not listen to what Appellant and his father told him to do; (2) he hid things, like razors, screws, and nails, in his room; (3) he dug the holes in the walls and peeled off the paint; and (4) he jumped off furniture. *Id.* at 77-78. Appellant testified M.K. tried to run away on April 6, 2017, and that in response, she installed the locks a day or two later. *Id.* at 79. She indicated she boarded up the windows "a few months later" because M.K. would hang out the window. *Id.* at 80.

---

[8] Spagnuolo testified that D.K showed no emotion when she removed him from the home — he did not cry or grab for anyone. N.T., 11/15/21, at 62-63. She noted M.K. was "very excited" to leave and used a derogatory word in reference to Appellant. *Id.* at 63.

Smith testified that when the boys arrived at her home, their bodies and clothes were dirty. N.T., 11/15/21, at 69. D.K.'s skin was very pale, his eyes were red and sunken in, and he did not make any noise or interact with anyone. *Id.* at 69-70. Smith found that M.K. did not act inappropriately and he did not destroy or hang off the furniture or damage the walls. *Id.* at 70-71. She indicated there was nothing behavior-wise about M.K. that concerned her. *Id.* at 72. She believed he engaged in "typical five-year-old behavior." *Id.* at 73.

Appellant took these measures because she wanted to ensure M.K.'s safety. *Id.* at 80.

Nevertheless, Appellant admitted to locking M.K. in his room, which "became an every night thing[,]" "to make sure he stayed in his room[.]" N.T., 11/15/21, at 80-81. She acknowledged that she locked him in the room during the day "a couple of times a week[,] but only for a maximum of ten to 15 minutes" when she was cleaning with chemicals. *Id.* at 81. Appellant later indicated the day-time detention was "[m]aybe three times a week depending on the behavioral issues." *Id.* at 81-82. She testified she took the set of bunk beds and dresser out of M.K.'s room because he would climb and jump off the furniture, and she removed toys from his room because he would hide them in there. *Id.* at 83-84. Appellant said there were no sheets or blankets on M.K.'s bed because he "spilled something" and the training potty was in the room for emergencies. *Id.* at 84. She denied that the carpet was soaked with urine or that Officer Severson and Frame provided her with a list of improvements for the home. *Id.* at 85-86. Instead, Officer Severson only told her to remove the locks. *Id.* at 85. When asked about the lack of clean clothes for the children, Appellant stated that she only did laundry once a week, and the incident happened one day prior to that designated laundry day. *Id.* at 86. She denied using locks with D.K. but also stated that she would lock the door to his room when she and the child left the property. *Id.*

She also refuted Officer Severson's testimony that there was a "padlock" on M.K.'s door and that there was any "screwdriver" on D.K.'s door. *Id.* at 89.

The jury found Appellant guilty of the two EWOC charges. On January 6, 2022, the trial court sentenced Appellant to consecutive periods of incarceration of 12 to 24 months. On January 10th, Appellant filed a post-sentence motion, raising three issues: (1) the evidence presented was insufficient to establish the elements of EWOC; (2) the verdict was against the weight of the evidence; and (3) the sentence was unreasonable and excessive because the trial court imposed consecutive sentences and failed to consider Appellant's reasons for her actions. Appellant's Motion for Post-Sentence Relief, 1/10/22, at 3-6. Two days later, the court entered an order denying Appellant's motion because it found the arguments were "non-meritorious." Order, 1/12/22.

On January 13, 2022, Appellant filed a timely notice of appeal, and subsequently complied with the trial court's order to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal.

Appellant presents three issues for our review:

1. [Whether t]he evidence presented by [the Commonwealth was] insufficient to establish the elements of the charges of [EWOC?]

2. [Whether t]he verdict was against the weight of the evidence as to shock the conscience as there was no evidence these children were locked in their rooms for long periods of time, that they were neglected[,] and in light of her testimony that her actions were out of a place of love, safety, care and control[?]

- 9 -

3. [Whether t]he sentence imposed was unreasonable and excessive in light of the sentencing factors as the [trial c]ourt imposed consecutive sentences and failed to consider Appellant's reasons for her actions[?]

Appellant's Brief at 7.[9, 10]

In her first issue, Appellant challenges the sufficiency of the evidence with respect to both EWOC convictions. *See* Appellant's Brief at 23. Appellant contends that the Commonwealth failed to provide any testimony that "she knowingly violated a duty of care, protection or support" to D.K. and M.K. *Id.* at 24. Appellant also alleges the Commonwealth failed to demonstrate that she engaged in "a course of conduct" that would support the finding that the offenses qualified as third-degree felonies. *Id.* She states:

> The testi[mony] presented could not prove that [Appellant] had locked M.K. and D.K. in their rooms for long periods of time. Not one witness had been there to see that occur and there was no testimony to that having occurred. Moreover, there was no evidence the children were locked in the rooms with dangerous items or deprived of the necessities of life. [Appellant] testified to the children being out of their rooms most of time, feeding them healthy meals, playing with them, teaching them, etc. There was no evidence [Appellant] caused any harm whatsoever to these children.

*Id.* at 24-25.

---

[9] We have reordered Appellant's claims for ease of disposition.

[10] The Commonwealth did not file a responsive brief in this matter.

Appellant also alleges that she "used the locks for M.K to keep him safe [and that t]he locks were used out of a place of love, safety, security and care." Appellant's Brief at 25. She further asserts that the locks and the boarding of the windows in M.K.'s room were to prevent the child from escaping the residence, gathering harmful items from around the residence, falling out of the second-story windows, or becoming injured when she was cleaning with chemicals or mowing the law. *Id.* Appellant concludes, "All of this evidence shows she was doing the opposite of . . . endangering the welfare of these children." *Id.* No relief is due.

We begin with our well-settled standard of review:

> As a general matter, our standard of review [for a sufficiency claim] requires that we evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

> The Commonwealth may sustain its burden by means of wholly circumstantial evidence. Accordingly, [t]he fact that the evidence establishing a defendant's participating in a crime is circumstantial does not preclude a conviction where the evidence coupled with the reasonable inferences drawn therefrom overcomes the presumption of innocence. Significantly, we may not substitute out judgment for that of the fact finder; thus, so long as the evidence adduced, accepted in the light most favorable to the Commonwealth, demonstrates the respective elements of a defendant's crimes beyond a reasonable doubt, the . . . convictions will be upheld.

- 11 -

*Commonwealth v. Windslowe*, 158 A.3d 698, 708-09 (Pa. Super. 2017) (citation omitted).

The crime of EWOC is defined, in relevant part, as follows: "A parent, guardian or other person supervising the welfare of a child under 18 years of age, or a person that employs or supervises such a person, commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection or support." 18 Pa.C.S. § 4304(a)(1). The EWOC statute provides that the term, "person supervising the welfare of a child," means "a person other than a parent or guardian that provides care, education, training or control of a child." 18 Pa.C.S. § 4304(a)(3).

> The "knowing" element of the crime applies to the general issue of whether the defendant knew that he was endangering the child's welfare, not whether the defendant knew that he would cause any particular result. For example, in *Commonwealth v. Passarelli*, 789 A.2d 708, 716 (Pa. Super. 2001), the Commonwealth presented evidence that the defendant was entrusted with the care of a child, whom he intentionally shook or struck on the side of the head. In ruling that the evidence was sufficient for EWOC, we wrote that "the act that [the defendant] performed on [the victim] was not designed to protect, care or support [the victim]."

*Commonwealth v. Smith*, 956 A.2d 1029, 1038 (Pa. Super. 2008) (*en banc*).

To establish a violation of Section 4304, the Commonwealth must demonstrate the following:

> 1) the accused is aware of his/her duty to protect the child;
> 2) the accused is aware that the child is in circumstances that could threaten the child's physical or psychological

- 12 -

welfare; and 3) the accused has either failed to act or has taken action so lame or meager that such actions cannot reasonably be expected to protect the child's welfare.

If the Commonwealth fails to prove any one of these elements, there is insufficient evidence to sustain a conviction for child endangerment.

*Commonwealth v. Pahel*, 689 A.2d 963, 964 (Pa. Super. 1997) (citation omitted).

In *Commonwealth v. Taylor*, 471 A.2d 1228 (Pa. Super. 1984), this Court discussed the legislature's intent in Section 4304:

The Supreme Court has said that Section 4304 was **drawn broadly to cover a wide range of conduct in order to safeguard the welfare and security of children. It is to be given meaning by reference to the common sense of the community and the broad protective purposes for which it was enacted.** Thus, the common sense of the community, as well as the sense of decency, propriety and the morality which most people entertain is sufficient to apply the statute to each particular case, and to individuate what particular conduct is rendered criminal by it.

*Id.* at 1231 (emphasis added; citations and quotation marks omitted).

Additionally, the offense constitutes a third-degree felony if "the actor engaged in a course of conduct of endangering the welfare of a child." 18 Pa.C.S. § 4304(b)(ii). The statute does not define the term "course of conduct." *See Commonwealth v. Kelly*, 102 A.3d 1025, 1031 (Pa. Super. 2014) (noting that "course of conduct" language in EWOC statute used in grading of offense, and not as element of offense, and pointing out that EWOC statute does not define term but highlighting that "the phrase is clearly used

- 13 -

in that context to differentiate the penalties for single and multiple endangering acts").

Here, the trial court found the following:

> [T]he facts presented at trial established that [Appellant], who cared for her biological child, two . . . years old, and her paramour's son, five . . . years old, while her paramour was working, would lock the children in separate bedrooms with padlocks on the outside of the doors. The condition of the rooms were deplorable. The eldest child's room contained only a stained mattress without bedding and a child's training toilet. The windows were boarded up such that there was no natural light and the carpet was saturated with what smelled like urine. The child was found wearing nothing but underwear. The younger child was sleeping in a second room in a dirty pack-and-play and the room was extremely cluttered. On the day following this discovery, the [CYS] caseworker returned to the home but there was no change. [Appellant]'s excuse was that she locked the children in the room to prevent the eldest child from harming himself and others. . . .
>
> Based on these facts, along with the other facts established at trial, this Court remains of the opinion that . . . the evidence was sufficient to prove that [Appellant] knowingly violated her duty of care, protection, or support to the two minor victims.

Trial Ct. Op., 2/1/22, at 4-5.

We agree with the trial court's determination that the evidence supported Appellant's convictions. A review of the record reveals that while no witness could provide specific testimony as to the length of time the children were locked in the bedrooms or that the children were deprived of the necessities of life, the jury could reasonably infer from the testimony that Appellant knowingly endangered the welfare of the children by violating her duty of care, protection or support. *See* 18 Pa.C.S. § 4304(a)(1).

First, Appellant was aware of her duty to protect the children as they were in her daily custody as a primary caregiver while her paramour worked. N.T., 11/15/21, at 47-48, 76.

Second, she was aware that the children were in circumstances that could threaten their physical or psychological welfare. Appellant rushed past the inspector to unlock the locks before he could observe the state of the doors and the fact that children were in those bedrooms. N.T., 11/15/21, at 20. Moreover, by her own admission, Appellant installed the locks in April 2017, five months prior to the inspection, and boarded up the windows several months later. *Id.* at 79. She admitted to locking M.K. in his room nightly. *Id.* at 80-81. Appellant also indicated she locked M.K. in his room during the day "[m]aybe three times a week depending on [his] behavioral issues." *Id.* at 81-82. She removed all furniture and toys from the room because of his purported bad behavior. *Id.* at 83-84. While Appellant denied using locks with D.K., Officer Severson observed her unlock the door with a screwdriver, while the child was inside the room. *Id.* at 23.

Third, Appellant failed to act to protect the children's welfare. We reiterate that "Section 4304 was drawn broadly to cover a wide range of conduct in order to safeguard the welfare and security of children" and it was refer "to the common sense of the community[.]" *Taylor*, 471 A.2d at 1231. In addition to the locks, there was evidence of the deplorable and unsanitary conditions of the children's bedrooms and the physical state of the children.

Officer Severson testified that there was a locked padlock on M.K.'s bedroom door, and in the room, he observed a mattress on the floor without sheets, minor holes in the wall, peeled paint, windows boarded up that did not let in any natural light, and M.K. wearing only underwear. *See* N.T., 11/15/21, at 20-22. Officer Severson also testified that he found D.K. in a locked room that Appellant had to unlock with a screwdriver. *See id.* at 23. In this room, he observed a lot of clutter and stacked furniture leaning towards the playpen where D.K. was placed. *See id.* at 23-24.

Frame, the CYS caseworker, testified that there was a strong smell of urine in the hallway near M.K.'s and D.K.'s rooms. Frame observed the carpet in M.K.'s room was saturated in urine, his mattress was soiled and urine-stained, the windows were boarded with drywall so no natural light could come through, and the covers to the baseboard heating vents had been removed, which created a dangerous condition. *See* N.T., 11/15/21, at 33-35. In the room that D.K. shared with Appellant, Frame observed D.K. sleeping in a "dirty" playpen, and there were blankets covering the windows, and lots of clutter. *Id.* at 36-37. Frame testified he returned to Appellant's residence the following day and did not observe any changes. *Id.* at 38, 45. Frame also stated that Appellant did not have any clean clothes for the children when they were removed from her custody. *Id.* at 50.

The evidence adduced at trial overwhelmingly established that the children's bedrooms were not suitable living conditions, that this environment

threatened the children's welfare, and Appellant failed to act in a proper way.

The jury was free to reject Appellant's explanation that her actions were out

of love, safety, security, and care, and find her responsible. *See Windslowe*,

158 A.3d at 708-09. As for Appellant's claim that there was insufficient

evidence to support the grading of the offense, she misconstrues the element

of "course of conduct" by solely focusing on the amount of time the children

were locked in their rooms. Although the EWOC statute does not define

"course of conduct," the phrase differentiates the penalties for single and

multiple endangering acts. *See Kelly*, 102 A.3d at 1031. Here, it was evident

that Appellant's nefarious actions constituted multiple endangering acts over

an extended period.

Viewing the evidence in a light most favorable to the Commonwealth,

we conclude there was sufficient evidence to sustain convictions for EWOC,

and that a jury could reasonably find a course of conduct that endangered the

welfare of M.K. and D.K. We find that Appellant's sufficiency claim is without

merit.

In Appellant's second issue, she asserts the verdict was against the

weight of the evidence as to her EWOC convictions because "she never

endangered the welfare of these children." Appellant's Brief at 21.[11] Appellant

_____

[11] Appellant properly preserved her challenge to the weight of the evidence in her post-sentence motion pursuant to Pa.R.Crim.P. 607(A). *See* Pa.R.Crim.P. 607(A)(1)-(3) (a challenge to the weight of the evidence must be raised before
*(Footnote Continued Next Page)*

again claims that "there was no evidence the children were locked in the rooms with dangerous items or deprived of the necessities of life." *Id.* She also maintains that there was no evidence that she "caused any harm whatsoever to these children." *Id.* at 22. Appellant relies on her own testimony — that she used the locks and boarded the windows to keep M.K. safe, and that she only locked the room she shared with D.K. when the two left the home — to support her argument. *Id.* at 22.

This Court's standard of review of a weight of the evidence claim is well-settled:

> A weight of the evidence claim concedes that the evidence is sufficient to sustain the verdict, but seeks a new trial on the ground that the evidence was so one-sided or so weighted in favor of acquittal that a guilty verdict shocks one's sense of justice. On review, an appellate court does not substitute its judgment for the finder of fact and consider the underlying question of whether the verdict is against the weight of the evidence, but, rather, determines only whether the trial court abused its discretion in making its determination.

*Commonwealth v. Lyons*, 79 A.3d 1053, 1067 (Pa. 2013) (citations omitted). Further, the jury, as fact finder, is free to believe all, some, or none or the evidence presented. *Commonwealth v. Jacoby*, 170 A.3d 1065, 1078 (Pa. 2017) (citations omitted). The jury is also free to "resolve any inconsistencies or discrepancies in the testimony in either party's favor." *Id.*

---

the trial court either before sentencing or in a post-sentence motion); *see also Commonwealth v. Walsh*, 36 A.3d 613, 622 (Pa. Super. 2012).

This Court will not find an abuse of discretion

based on a mere error of judgment, but rather . . . where the [trial] court has reached a conclusion which overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will. Importantly, [this C]ourt should not find that a trial court abused its discretion merely because [we] disagree[ ] with the trial court's conclusion. Indeed, "when reviewing the trial court's exercise of discretion, it is improper for [this C]ourt to 'step[ ] into the shoes' of the trial judge and review the evidence *de novo*." In other words, [this C]ourt may not disturb a trial court's discretionary ruling by substituting its own judgment for that of the trial court.

***Commonwealth v. Gill***, 206 A.3d 459, 467 (Pa. 2019) (citations and some quotation marks omitted).

In denying Appellant's weight claim, the trial court relied on the same evidence it considered to reject her sufficiency argument. ***See*** Trial Ct. Op., at 4-5. As addressed above, the court highlighted the following facts: (1) the "deplorable" conditions of the children's bedrooms; (2) the physical state of the children; (3) and Appellant's sole justification for her actions was "prevent[ing] the eldest child[, M.K.,] from harming himself and others." ***Id.***

Appellant's argument amounts to a request for this Court to reweigh the evidence in her favor. This request is beyond our scope of review. As the jury was free to believe all, part, or none of the evidence, we may not re-weigh the evidence or disturb the jury's credibility determinations. ***See Jacoby***, 170 A.3d at 1078. The jury heard from all the witnesses, including Officer Severson, Frame, and Smith, and found them to be credible based on the convictions. The jury considered Appellant's self-serving testimony and

found her incredible. We decline to substitute our credibility determinations for that of the jury. *See Jacoby*, 170 A.3d at 1078; *Lyons*, 79 A.3d at 1067. Moreover, the jury's verdict was supported by the evidence and does not shock one's sense of justice. We conclude Appellant failed to demonstrate how the trial court abused its discretion in denying her challenge to the weight of the evidence, and no relief is due.

Appellant's final claim presents a challenge to the discretionary aspects of her sentence, that sentence was unreasonable and excessive in light of the sentencing factors and her reasons for her actions. *See* Appellant's Brief at 16; *see also Commonwealth v. Ahmad*, 961 A.2d 884, 886 (Pa. Super. 2008) ("A challenge to an alleged excessive sentence is a challenge to the discretionary aspects of a sentence."). Before this Court can address a discretionary challenge in sentencing, an appellant must comply with the following requirements:

> An appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction by satisfying a four-part test: (1) whether appellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. [720]; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code.

*Commonwealth v. Caldwell*, 117 A.3d 763, 768 (Pa. Super. 2015) (citation omitted).

- 20 -

Here, a review of the record reveals Appellant properly preserved her discretionary aspects of sentencing issue by including it in her January 10, 2022, post-sentence motion, filing a timely notice of appeal, and including a Pa.R.A.P. 2119(f) statement in her brief. *See* Appellant's Brief at 14-15. Thus, we must determine whether she has raised a substantial question justifying our review.

> The determination of what constitutes a substantial question must be evaluated on a case-by-case basis. A substantial question exists only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process.

*Commonwealth v. Proctor*, 156 A.3d 261, 273 (Pa. Super. 2017) (citations and quotation marks omitted). "We cannot look beyond the statement of questions presented and the prefatory Rule 2119(f) statement to determine whether a substantial question exists." *Commonwealth v. Crawford*, 2021 PA Super 62, 257 A.3d 75, 78-79 (Pa. Super. 2021).

In Appellant's Rule 2119(f) statement, she contends the trial court abused its discretion and imposed an excessive length of sentence, complaining:

> [H]er sentence is unreasonable because the [trial] court focused on exclusively its belief that the children were locked in isolation and that their mental health could have been [a]ffected permanently. The [trial] court completely failed to give appropriate and meaningful consideration to, among other things, the legislature's account for this through the sentencing guidelines, the fact that no testimony was presented to show [Appellant's] actions were not out of a place of love, safety, care, and control as was testified to by her. There was absolutely no[ ]

- 21 -

testimony presented which would have show[ed] the children were living in isolation by being locked in their rooms for the periods of time [as] testified to by [Appellant].

Appellant's Brief at 14-15.

This Court has previously determined that a substantial question exists when the issue is "whether the decision to sentence consecutively raises the aggregate sentence to, what appears upon its face to be, an excessive level **in light of the criminal conduct**[.]" ***Commonwealth v. Gonzalez-DeJusus***, 994 A.2d 595, 598-99 (Pa. Super. 2010) (emphasis added). We interpret Appellant's claim to fall under this type of substantial question. Thus, we may proceed to consider the merits of her claim.

Appellant asserts the trial court failed to give "meaningful consideration" of the sentencing factors by imposing a patently excessive sentence. Appellant's Brief at 18. She contends the court "obsessively focused on [its] belief that this was long, [on]going treatment of these children that could have affected their mental health when there was no testimony as to how long this had been occurring." ***Id.*** Appellant also claims the court failed to give appropriate weight to mitigating factors, such as her lack of a prior criminal history, and that she has not committed any additional crimes and has attended every required criminal proceeding. ***Id.*** at 19. Finally, she points out that she was employed while out on bail. ***Id.*** No relief is due.

We have a deferential standard of review for discretionary aspects of the sentence claims:

Sentencing is a matter vested within the discretion of the trial court and will not be disturbed absent a manifest abuse of discretion. An abuse of discretion requires the trial court to have acted with manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous.

*Commonwealth v. Crump*, 995 A.2d 1280, 1282 (Pa. Super. 2010)(citations omitted).

Pursuant to 42 Pa.C.S. § 9721(b), "the [trial] court shall follow the general principle that the sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant." 42 Pa.C.S. § 9721(b). "[T]he court shall make as part of the record, and disclose in open court at the time of sentencing, a statement of the reason or reasons for the sentence imposed." *Id.* The record "must reflect the [trial] court's consideration of the facts of the crime and character of the offender." *Crump*, 995 A.2d at 1283. "In particular, the court should refer to the defendant's prior criminal record, his age, personal characteristics and his potential for rehabilitation." *Commonwealth v. Griffin*, 804 A.2d 1, 10 (Pa. Super. 2002).

We emphasize the trial court "is in the best position to measure various factors and determine the proper penalty for a particular offense based upon an evaluation of the individual circumstances before it." *Commonwealth v. Perry*, 32 A.3d 232, 236 (Pa. 2011) (citation and quotation marks omitted). "Where pre-sentence reports exist, we shall continue to presume that the

sentencing judge was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors." ***Commonwealth v. Devers***, 546 A.2d 12, 18 (Pa. 1988).

Here, the trial court had the benefit of the pre-sentence investigation report. ***See*** N.T., 1/6/22, at 2. Appellant had a prior record score of zero, and the offense gravity score for both EWOC counts was six. ***See*** Trial Ct. Op. at 2. The applicable sentencing guidelines provide that the standard range was three to 12 months, with an additional six months in the aggravated range. ***Id.*** As noted above, the court sentenced Appellant to consecutive terms of 12 to 24 months' incarceration, which was at the top end of the standard range. ***See*** N.T., 1/6/22, at 10.

"Where the sentencing court impose[s] a standard-range sentence with the benefit of a pre-sentence report, we will not consider the sentence excessive. In those circumstances, we can assume the sentencing court was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors." ***Commonwealth v. Corley***, 31 A.3d 293, 298 (Pa. Super. 2011).

Nonetheless, at sentencing, the court received updated information regarding Appellant's employment status. N.T., 1/6/22, at 3. The court also heard additional testimony from Frame, who stated that the children were malnourished and that after the children had been removed from the home, Appellant texted Frame about "appropriate window locks." ***Id.*** at 6-7. Frame

testified: "So this [was not] about the care and the love of these children. She hated [M.K.]." *Id.* at 7.

In seeking an aggravated range sentence, the Commonwealth noted the following:

> The conditions in which these children lived, deplorable does not begin to describe their situation and plight. At [two], the younger child was not speaking and shied away. At five, the older child, spoke up and called [Appellant] an asshole. At five.
>
> [M.K.] lived with a mattress, a potty, and a dirty blanket in a urine-stained room with a lock. . . . That is not parenting. That is not mothering.
>
> [Defense] counsel argued that [Appellant] maintains she provided safety, care, and control. Those are three words that cannot be used to describe what she did to those children. There is no safety [for a two] and five [year old] locked in a room. There is no safety without food and love and nourishment. There is no care.
>
> I will give [Appellant] credit, control is what she had. At [two] and five you don't have control, others do. She had control, and she exercised it poorly. [Defense] counsel argues her rights were terminated. I applaud that termination, but that is not her punishment today. That was a separate collateral effect of her behavior that should not move the [c]ourt towards leniency today.
>
> Beyond safety, care, and control, counsel argues [Appellant] showed love and care and a safe environment; and those are simply not true. The allegations come from the mouth of a five-year-old, the actions of a [two]-year-old, the admission by the father of both children, the observations of disinterested parties that saw boarded windows and locked doors. That all undercuts her position for safety, care, and control.
>
> Your Honor, the allegations are beyond egregious. They're disgusting. We would ask that the [c]ourt impose a sentence above the standard range for this individual to reflect the everlasting impact she has personally had on those two young individuals.

*Id.* at 8-9. Appellant did not exercise her right to allocution and speak at the hearing.

At the conclusion of the proceeding, the court set forth its rationale:

The Court[,] in reaching this determination, [heard] the explanation given by [Appellant] in that she was intending to . . . protect these children; but [it was] not sure what she was trying to protect them from.

Preventing them from having the necessary food and water, having nothing — a five-year-old having nothing beyond a mattress in a room, which [it] clearly remember[ed] the testimony that the lower portion of the living premise was fully furnished and kept nice and tidy and was [as] if the children were not allowed to be outside that room.

That does not . . . match up with trying to take care of these children. There [was] nothing that was stated there that would support her position. And, quite honestly, we're only here on [EWOC] charges because a code officer reported this.

There was nothing that [indicated] this behavior was going to self-correct. This was not an isolated incident of the one time a caregiver inappropriately handl[ed] a child. . . .

This was a long, ongoing treatment of these children. This could have resulted in their deaths due to [a] lack of nourishment. If that wasn't the case, it could have been the . . . mental health of these children having lived in insolation, what it could have done to them.

That's why [it did] not find this to be a case appropriate at all for a mitigated sentence, and that is why [it] imposed the top of the standard range on each of these counts as there [were] two separate children who have suffered this harm.

*Id.* at 10-11.

In its Pa.R.A.P. 1925(a) opinion, the trial court added:

While the [c]ourt found [Appellant]'s actions to be inhumane and, if not for the intervention from a third party, would have carried on indefinitely, the [c]ourt's sentence was within the standard range of the sentencing guidelines. [Appellant]'s actions were callus and will have a lifetime impact on the victims. Additionally, the [c]ourt was within its discretion to impose consecutive sentencing, considering the fact that there are two separate victims in this case.

Trial Ct. Op. at 3.

Under our standard of review, we conclude the trial court did not abuse its discretion with regard to Appellant's sentence. Contrary to her argument, it is evident from the sentencing hearing and the Rule 1925(a) opinion that the court considered the required factors under Section 9721(b). Likewise, the court acknowledged its understanding of the sentencing guidelines, and articulated a sufficient statement of reasons for its sentence. Contrary to Appellant's assertion that there no testimony as to how long her abuse had been occurring, the record clearly demonstrates that it persisted for a substantial period based on the conditions of the children and the home. Therefore, the court was justified in emphasizing the lasting effect of Appellant's treatment of the children on their mental health. Accordingly, Appellant's discretionary sentencing claim fails.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>08/16/2022</u>